United States District Court
Southern District of Texas

**ENTERED**

April 07, 2021

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NUMBER H-18-405-05 |
| | § | |
| ANDY BADENOCK, | § | |
| | § | |
| Defendant. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Defendant Andy Badenock ("Defendant") has filed a Motion to
Suppress the Results of Illegally Obtained Wire Intercept, or to
Dismiss the Indictment Based on a Violation of the Right to a
Speedy Trial ("Defendant's Motion") (Docket Entry No. 230).  For
the reasons explained below, Defendant's Motion will be denied.

I.   <u>Factual and Procedural Background</u>

A.   **Interception of Wire Communications**

On December 28, 2015, the Government filed and this court
signed an affidavit and application for the continued interception
of wire communications in Cause No. 15-MC-3087.[1]  The order was a
continuation of a previous order signed on November 10, 2015, by

---

[1]Affidavit in Support of Application ("Agent Gainer's
Affidavit"), attached as Exhibit 1 to Government's Response to
Defense Motion to Suppress or to Dismiss Indictment Based On
Violation of the Right to a Speedy Trial ("Government's Response"),
Docket Entry No. 235-2, pp. 2, 54.  All page numbers for docket
entries in the record refer to the pagination inserted at the top
of the page by the court's electronic filing system, CM/ECF.

the Honorable Alfred H. Bennett authorizing the interception of wire communications to and from telephone numbers (281) 520-7823 ("Target Device #1") and (713) 202-1744 ("Target Device #3").[2] The interception was part of an investigation into what the Government called the "Dickson Drug Trafficking Organization" ("DTO"), so called because its leaders were identified as Deon and Regina Dickson ("D. Dickson" and "R. Dickson," respectively).[3] Investigators identified D. Dickson as the user of Device #1 and R. Dickson as the user of Device #3.[4]  Judge Bennett's order authorized interception of communications to and from these devices for a thirty-day period ending on December 15, 2015.[5]  The new order extended the interception for an additional thirty days.[6]

Special Agent James Gainer ("Agent Gainer") of the Drug Enforcement Agency ("DEA") submitted an affidavit in support of the December 28, 2015, application summarizing the Government's months-long investigation into the Dickson DTO.  The affidavit contained facts implicating the Dicksons.

The affidavit states that in June of 2015 "the DEA Houston Field Division obtained information from DEA Dallas in reference to

---

[2] Id. at 11 ¶ 13a.

[3] Id. at 3-4 ¶¶ 5-6.

[4] Id. at 3-4 ¶¶ 5a-5b.

[5] Id. at 4 ¶ 6.

[6] Id. at 2, 54.

information obtained from a Confidential Source . . . who indicated **D. DICKSON** and **R. DICKSON** are members of a drug trafficking organization responsible for distributing multiple kilogram quantities of cocaine, heroin and methamphetamine."[7] This confidential source, referred to as "CS-1," had met with the Dicksons in Dallas in April of 2015 to discuss a plan for distributing large amounts of cocaine and methamphetamine.[8] The meeting was audio-recorded.[9] The Dicksons explained that they would travel once a month to Chicago, Illinois, to distribute drugs (usually transported in twenty-kilogram increments) and then return back to Texas.[10]

On June 3, 2015, CS-1 contacted Regina Dickson on Target Device #3 to arrange another meeting.[11] In the audio-recorded conversations that followed, the Dicksons told CS-1 that they wanted him to assist in the distribution of cocaine from Houston, Texas, to Chicago, Illinois, utilizing CS-1's contacts in Chicago.[12] They also discussed a potential scheme to sell diverted oxycodone pills with CS-1's help: R. Dickson said she could call a clinic (which DEA Houston was already investigating as a suspected "pill

---

[7]Id. at 11 ¶ 14.

[8]Id. at 12 ¶ 15.

[9]Id.

[10]Id. at 12-13 ¶ 15.

[11]Id. at 13 ¶ 16.

[12]Id.

-3-

mill") and "vouch" for CS-1 to assist him in getting an oxycodone prescription.[13]  She met with CS-1 again on August 7, 2015, to discuss the purchase of 500 to 1000 oxycodone pills.[14]  On September 9, 2015, Agent Gainer met with an individual who claimed to have obtained hydrocodone pills from the same clinic R. Dickson had referred to.[15]  Agent Gainer purchased 200 oxycodone pills from this individual.[16]

On September 19, 2015, an Indiana state trooper seized 18 kilograms of cocaine from a tractor trailer that he stopped near Indianapolis, Indiana.[17]  The driver of the tractor trailer identi-fied his dispatcher as "Dion."[18]  Agent Gainer determined that "Dion" is D. Dickson because the driver of the trailer provided a telephone number that matched D. Dickson's (Target Device #1).[19]  The driver was charged with possession of cocaine, and D. Dickson bailed him out of jail by paying a $30,000 cash bond with a cashier's check.[20]

On October 7, 2015, Agent Gainer debriefed a second confidential source ("CS-2") who claimed to have knowledge of the

---

[13]Id. at 14 ¶ 17.

[14]Id. at 15 ¶ 19.

[15]Id. at 16 ¶ 20.

[16]Id.

[17]Id. at 17 ¶ 21.

[18]Id.

[19]Id. at 17-18 ¶ 21.

[20]Id. at 18 ¶ 21.

-4-

shipment that was seized near Indianapolis.[21]  CS-2 indicated that
the cocaine was owned by one James Grady (aka "Scooby"[22]), a
multiple-kilogram cocaine and heroin distributor who used to supply
CS-2 with 10-15 kilograms of cocaine per week for approximately
nine months.[23]  CS-2 further indicated that Grady and D. Dickson
were partners, that they owned an automobile sales business
together ("Houston Auto Express"), and that the cocaine seized near
Indianapolis was ultimately sourced to D. Dickson.[24]  CS-2 believed
that the auto sales business was being used to load vehicles with
cocaine.[25]  CS-2 further indicated that the Dickson DTO distributed
cocaine to Detroit utilizing a person known to CS-2 as "Michael,"
whom investigators suspected was Michael Gaines.[26]  Agents
surveilling Gaines's residence in Katy, Texas, observed what
appeared to be vehicle rims and tires removed from a black
Chevrolet Impala and transferred to a silver Dodge pickup truck
that was later observed in Detroit.[27]

---

[21]Id. at ¶ 23.

[22]Indictment, Docket Entry No. 1, p. 1.

[23]Agent Gainer's Affidavit, Exhibit 1 to Government's Response,
Docket Entry No. 235-2, pp. 18-19 ¶ 23.

[24]Id. at 19 ¶ 23.

[25]Id. ¶¶ 23-24.

[26]Id. ¶ 24.

[27]Id. at 19-20 ¶ 24.

On November 16, 2015, Agent Gainer began intercepting wire communications over Target Devices ##1 and 3.[28]  On November 17, 2015, intercepted conversations over Target Device #1 indicated that D. Dickson was sending a driver in a tractor trailer — the same trailer that had been seized near Indianapolis — to McAllen, Texas, to pick up a load of produce.[29]  Agents intercepted telephone calls to a person later identified as Raymond Martinez Marsh in which D. Dickson instructed Marsh to travel to McAllen.[30]  On November 18, 2015, agents determined that D. Dickson was flying from Houston to McAllen to meet Marsh.[31]  Several intercepted calls indicated that D. Dickson would broker a cover-load of tomatoes to be transported in the tractor trailer, and that he was coordinating with Marsh and an unknown person to meet on a rural road.[32]

After leaving the meeting location, Marsh departed McAllen traveling to the Border Patrol Falfurrias checkpoint.[33]  When Marsh arrived at the checkpoint, a Border Patrol K-9 dog alerted to the presence of narcotics in the tractor trailer.[34]  Border Patrol agents seized approximately 350 lbs of marijuana located under the

---

[28]Id. at 20 ¶ 25.

[29]Id.

[30]Id.

[31]Id.

[32]Id.

[33]Id.

[34]Id.

tomatoes while searching the trailer.[35] Marsh was detained, interviewed, and subsequently released.[36] During the interviews Marsh identified himself as the brother of D. Dickson.[37] Over several telephone calls intercepted after the seizure, Marsh explained to D. Dickson the details of the police interviews and that he suspected that law enforcement had previous knowledge of his tractor trailer.[38]

On November 24, 2015, as a result of intercepted calls and surveillance of D. Dickson, Agent Gainer came to suspect that Grady and a co-conspirator were planning to meet in Detroit, Michigan.[39] Surveillance observed the DTO members meet at Gaines's Detroit residence.[40] During the surveillance operation, agents observed D. Dickson arrive at the residence with a gym bag, then depart with what appeared to be an empty gym bag.[41] An intercepted conversation between D. Dickson and R. Dickson indicated that the deal was done.[42] A search warrant was executed at a residence in Detroit, Michigan, resulting in the seizure of approximately 18 kilograms of

---

[35] Id.

[36] Id.

[37] Id.

[38] Id. at 20-21 ¶ 25.

[39] Id. at 21 ¶ 26.

[40] Id.

[41] Id.

[42] Id.

cocaine, 58 grams of heroin, 28 bottles of promethazine and an undetermined amount of United States currency.[43]

On December 3, 2015, intercepted conversations over Target Devices ##1 and 2 indicated that D. Dickson and R. Dickson were traveling to Jacksonville, Florida, to facilitate what Agent Gainer believed was a drug transaction.[44]   Further intercepted calls indicated D. Dickson and R. Dickson reserved a hotel room at the airport Holiday Inn Express.[45]   Surveillance later observed D. Dickson and R. Dickson arrive at the hotel with a person later identified as Seon Guy who had arrived in a vehicle with a Texas registration.[46]   Agents maintained surveillance on the vehicle until it was observed departing the hotel.[47]   A traffic stop was subsequently initiated on the vehicle, and Guy provided a story with conflicting details to the officers.[48]   Agent Gainer's Affidavit states that a search of Guy's vehicle yielded "several kilogram cocaine wrappers along with other drug paraphernalia."[49]

On December 4, 2015, intercepted conversations between D. Dickson and R. Dickson indicated that R. Dickson was planning to

---

[43] Id.

[44] Id. at ¶ 27.

[45] Id.

[46] Id.

[47] Id.

[48] Id.

[49] Id. at 21-22 ¶ 27.

depos   an unspecified amount of U.S. currency in a bank account for D. Dickson.[50] R. Dickson also indicated that she would be returning to the Houston Hobby airport at 11:00 AM and that Marsh would be picking her up.[51] Agents determined that R. Dickson would be returning to Houston on a Southwest Airlines flight and subsequently coordinated with the Houston Police Department to interdict R. Dickson as she departed the aircraft.[52] R. Dickson subsequently gave officers consent to search her belongings and luggage.[53] Officers recovered approximately $100,000 USD from the search.[54] R. Dickson explained to officers that she had been in Florida to sell a car and money seized was proceeds from the vehicle sale.[55] R. Dickson did not cooperate with law enforcement, no charges were filed, and R. Dickson was not arrested at the airport.[56]

Investigators also intercepted several calls implicating Defendant as a drug broker and facilitator.[57] On December 4, 2015,

---

[50]Id. at 22 ¶ 28.

[51]Id.

[52]Id.

[53]Id.

[54]Id.

[55]Id.

[56]Id.

[57]Id. at 7 ¶ 9(g).

Defendant called D. Dickson at Target Device #1 and had the following conversation:

| | |
|---|---|
| DEFENDANT: | What's up you guys good? |
| D. DICKSON: | Oh yeah, I'm in the CHI picking up my birth certificate. |

. . .

| | |
|---|---|
| D. DICKSON: | Yeah and then Gina should be headed home. |
| DEFENDANT: | Uh-huh. |
| D. DICKSON: | Or I'll be there in a couple hours. |
| DEFENDANT: | I was just checking to make sure everybody was good.  You know he's gonna be gone[,] right? |
| D. DICKSON: | Yeah I got that feeling. |
| DEFENDANT: | Yeah, he's gonna be gone . . . |
| D. DICKSON: | Lazy dude, he . . . We told him.  We like Dude why you running around at night with this car?  You know what I'm saying?  Windows blacked out with Texas tags. |
| DEFENDANT: | Especially in hot-ass Jacksonville. |

. . .

| | |
|---|---|
| DEFENDANT: | They didn't get nothing. |
| D. DICKSON: | Yeah well, then it had to be with his spouse, or something. |
| DEFENDANT: | Or with BALO, cause [] he got like four (4) or five (5) little places or so.  You know what I'm saying?  But I know Kevon know where it is but, you know, I just need to make it clear to him that, you know what I am saying? . . . That's the only way they gon' . . . that basically do right if I, you know . . . |
| D. DICKSON: | Uh-huh. |

DEFENDANT:     Shit, I'm on the hook.[58]

Agent Gainer stated in his affidavit that he interpreted this call as Defendant asking whether the Dicksons had been in contact with law enforcement following Seon Guy's arrest in Jacksonville, Florida.[59]   Agent Gainer further stated that he interpreted D. Dickson's remark about a "[l]azy dude" "running around at night" with a car that had blacked-out windows and Texas tags as a reference to Guy.[60]  Defendant's comment that the person in question had been in "hot-ass Jacksonville" further suggested that the person was Guy, and that his arrest was no surprise given his activity in an area with a high police presence.[61]  Agent Gainer took Defendant's remark that "[t]hey didn't get nothing" to mean that the officers who arrested Guy only seized wrappers from the vehicle but did not seize any cocaine.[62]   When D. Dickson stated that "it had to be with his spouse or something," Agent Gainer took that to mean that D. Dickson was referring to where he thought the cocaine was being kept.[63]  Agent Gainer took Defendant's reply to be a reference to an unknown person named "BALO" having four or

---

[58]Id. at 24 ¶ 31.

[59]Id. at 25 ¶ 32.

[60]Id.

[61]Id.

[62]Id.

[63]Id. at 25-26 ¶ 32.

-11-

five drug-stash locations.[64]  When Defendant stated "I'm on the hook," Agent Gainer took that to mean that Defendant was saying he would be held responsible for the safekeeping of the kilograms of cocaine.[65]

That same day, Defendant called R. Dickson on Target Device #3.[66]  During this conversation R. Dickson asked if "TI knows her last name," which led to the following exchange:

DEFENDANT:      Not at all[,] there is no way for him to know it. . . .  He is not like that . . . there are a lot of things that he would say that he might be, but he would go before he puts anybody in anyway.

R. DICKSON:     The only thing I can think of is because my bank account number is in his phone.

DEFENDANT:      What was it doing in his phone?

D. DICKSON:     Remember when I had him deposit the other day?[67]

Defendant said he did not remember, then asked what "they" could do with the account.[68]  Defendant asked R. Dickson if "it" went through the scanner, and R. Dickson replied "yea but they would have stopped me there.  I left there and stopped in Atlanta

---

[64] Id. at 26 ¶ 32.

[65] Id.

[66] Id. at 30 ¶ 39.

[67] Id.

[68] Id.

and then came to Houston."[69]  Defendant and R. Dickson continued to discuss if "they" could see where R. Dickson was going.[70]

Agent Gainer interpreted this conversation as an attempt by R. Dickson to determine whether Guy had cooperated with law enforcement after his arrest.[71]  When Defendant stated that the individual in question would "go before he puts anybody in," Agent Gainer took it as Defendant's attempt to assure R. Dickson that Guy would sooner go to jail than cooperate with law enforcement.[72]

## B.  Defendant and Co-Conspirators Indicted

The facts set forth above, together with Agent Gainer's explanation as to why other investigative techniques would not meet the investigation's goals,[73] persuaded the court to sign the application approving continued wire interception for an additional thirty-day time period, ending in January of 2016.  Defendant acknowledges that the Government interviewed the Dicksons the same month, and that both D. Dickson and R. Dickson told the Government that Defendant was involved in a cocaine shipment that authorities had seized earlier in Jacksonville, Florida.[74]  The superseding

---

[69]Id.

[70]Id.

[71]Id. at 31 ¶ 40.

[72]Id.

[73]Id. at 34-50 ¶¶ 45-68.

[74]Defendant's Motion, Docket Entry No. 230, p. 9.

-13-

indictment charges that Defendant's involvement in the conspiracy to distribute cocaine ended in January of 2016.[75]

Defendant was not indicted until July 18, 2018, when the Government charged him and seven other defendants with conspiracy to "possess with the intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine," in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(ii).[76]   On November 7, 2019, the United States filed a Superseding Indictment that charged an additional means of committing the offense of conspiracy and amended the time frame of the conspiracy.[77]

## II.  Motion to Suppress

Defendant seeks a hearing on the adequacy of Agent Gainer's Affidavit[78] and seeks to suppress all evidence obtained as a result of wire intercepts of Target Devices ##1 and 3.[79]

> Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment, as

---

[75]Superseding Indictment, Docket Entry No. 135, p. 1.

[76]Indictment, Docket Entry No. 1, p. 1.

[77]Superseding Indictment, Docket Entry No. 135, pp. 1-2.

[78]Defendant's Motion, Docket Entry No. 230, p. 8.

[79]Id. at 1, 8.

-14-

incorporated in the Fourteenth Amendment, requires that a hearing be held at the defendant's request.

Franks v. Delaware, 98 S. Ct. 2674, 2675 (1978).

There is a presumption of validity with respect to the affidavit supporting a search warrant, and "[t]o overcome this presumption, 'the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.'" Forbes v. Harris County, Texas, 804 F. App'x 233, 239 (5th Cir. 2020) (quoting Franks, 98 S. Ct. at 2684). A challenger to a search-warrant affidavit must therefore not only allege that the affiant deliberately, or with reckless disregard for the truth, attested to falsehoods, but also must offer proof of deliberate falsities. See id. "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient." Franks, 98 S. Ct. at 2684. When a challenge rests on an affiant's omission of facts from the affidavit, the challenger must present evidence "directly illuminating the state of mind of the affiant[.]" United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980). "[T]he accused bears the burden of showing by a preponderance of the evidence that the omission was more than a negligent act." Id.

Even if the challenger makes a showing of deliberate falsity or reckless disregard for the truth by the affiant, the inquiry is not over — the challenger "is not constitutionally entitled to a

-15-

hearing 'if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause.'" United States v. Privette, 947 F.2d 1259, 1261 (5th Cir. 1991) (quoting Franks, 98 S. Ct. at 2684-85).

Defendant argues that (1) Agent Gainer's Affidavit falsely characterized the wrappers found in Seon Guy's car on December 3, 2015, as "kilogram cocaine wrappers,"[80] (2) Agent Gainer failed to mention that Guy's case was not prosecuted after Guy's arrest on December 3, 2015,[81] and (3) Agent Gainer deliberately withheld the fact that the Dicksons owned a used car business, a fact which might have explained why R. Dickson had $100,000 USD at the Hobby Airport on December 4, 2015.[82]  Defendant contends that these statements were "at the very least" made with "reckless disregard for the truth."[83]

The Government responds that (1) no false statement, intentional, knowing, or with reckless disregard for the truth was made in Agent Gainer's Affidavit, (2) Agent Gainer never deliberately withheld any evidence, and (3) even if the complained-of statements were removed, Agent Gainer's Affidavit would still

---

[80]Defendant's Motion, Docket Entry No. 230, p. 6.

[81]Id.

[82]Defendant's Motion, Docket Entry No. 230, pp. 4-5.

[83]Defendant's Motion, Docket Entry No. 230, p. 7.

show ample probable cause for the continuation of the wire intercepts.[84]

## A.   Seon Guy's Arrest

Defendant argues that "the major basis for the proposed intercept of the target devices involved what Special Agent Gainer alleges was a December 3, 2015 drug transaction involving Deon Di[cks]on, Regina Di[cks]on, and . . . Seon Guy."[85]   Defendant asserts that the "only evidence" that the alleged transaction occurred is Agent Gainer's contention that "several kilogram cocaine wrappers" were found in Guy's vehicle when Guy was arrested in Jacksonville, Florida, for possession of drug paraphernalia.[86] Defendant objects to the characterization of the wrappers as "kilogram cocaine wrappers," given that Guy's arrest report does not so characterize the bags but instead indicates only that "numerous vacuum seal bags, plastic wrappers, and packaging material" were found in his vehicle, and that this is "a common procedure for packaging and transporting drugs."[87]   Defendant has produced an affidavit signed by Guy in which he states that "upon the State expert's examination of the evidence it was revealed that

---

[84]Government's Response, Docket Entry No. 235, p. 5.

[85]Defendant's Motion, Docket Entry No. 230, p. 2.

[86]Id.

[87]Id. at 3-4.

the sandwich bags contain[ed] peanut butter and jelly for my children."[88]

The Government responds that "[a]t no point in time during the traffic stop did Guy state the bags were his, were for his kids, or contained peanut butter and jelly sandwiches."[89]  The Government further states that there is no lab report showing that there was peanut butter and jelly residue in the wrappers[90] and that the Jacksonville Sheriff's Office confirmed that no laboratory testing was done on the suspected cocaine wrappers.[91]

Defendant has not produced a lab report.  The only evidence that Defendant has produced to support his contention that the bags contained sandwiches is the affidavit of a convicted felon who was deported to Trinidad and Tobago in August of 2016[92] and who may have been an unindicted co-conspirator in the Dickson DTO.  This is not the kind of "reliable statement" that can overcome a search-warrant affidavit's presumed validity.  See Franks, 98 S. Ct. at 2684.

Moreover, Agent Gainer's Affidavit made clear that he believed that the intercepted call between Defendant and D. Dickson on December 4, 2015, confirmed Guy's involvement with the Dicksons and

---

[88]Affidavit of Seon Joel Guy, Attachment 3 to Defendant's Motion, Docket Entry No. 230-3, p. 7.

[89]Government's Response, Docket Entry No. 235, p. 3.

[90]Id. at 4.

[91]Id. at 9.

[92]EARM Case Summary for Seon Joel Guy, Attachment 3 to Government's Response, Docket Entry No. 235-2, p. 65.

Defendant in a drug transaction.[93] In that call D. Dickson and Defendant discussed Guy's traffic stop, and Defendant stated that "[t]hey didn't get nothing. [T]he[y] got like four (4) or five (5) little places or so."[94] The Government asserts that Agent Gainer's belief "was and still is that [Defendant] is referring to law enforcement only seizing wrappers, the rest of the cocaine being somewhere else, in four or five drug stash locations[.]"[95] Defendant has offered no evidence that would cast doubt on Agent Gainer's credibility. The court thus concludes that Defendant has not made a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth," was included in Agent Gainer's Affidavit. See id. at 2675.

Defendant argues that Agent Gainer failed to tell the court that "the case against Guy for possession of drug paraphernalia was dismissed on December 16, 2015, when the prosecutor filed a drop notice with the court in Duval County, Florida, indicating that she was declining to prosecute Guy on the charges."[96]

The record shows that Guy's case was dismissed.[97] Agent Gainer's Affidavit makes no mention of the dismissal. But nothing

---

[93]Agent Gainer's Affidavit, Attachment 1 to Government's Response, Docket Entry No. 235-2, pp. 25-26 ¶ 32.

[94]Id. at 24 ¶ 31.

[95]Government's Response, Docket Entry No. 235, p. 4.

[96]Defendant's Motion, Docket Entry No. 230, p. 2.

[97]See DN Disposition Notice, Attachment 1 to Defendant's Motion, Docket Entry No. 230-3, p. 2.

in the record suggests that Agent Gainer withheld this fact deliberately or even knew of the dismissal in the first place. Defendant bears the burden of proving by a preponderance of the evidence that Agent Gainer's omission was more than a negligent act. See Martin, 615 F.2d at 329. "[T]here is no evidence in the record directly illuminating the state of mind of the affiant [Agent Gainer], when he omitted from the affidavit the fact[] that [paraphernalia charges against Guy were dropped], for [Defendant] proved little more than that these omissions were made." See id. Accordingly, the court concludes that Defendant has failed to meet his burden.

Moreover, even if Defendant had shown that Agent Gainer's statements and omissions regarding Seon Guy's arrest were deliberately deceptive, and all references to the arrest were "set to one side," there would remain "sufficient content in the warrant affidavit to support a finding of probable cause." See Privette, 947 F.2d at 1261. Defendant argues that "[Agent Gainer's Affidavit] contends that the major basis for the proposed intercept of the target devices" was the alleged drug transaction between Guy and the Dicksons on December 3, 2015.[98] The court disagrees. The "major basis" for the wire intercepts was the wealth of recorded conversations and testimony from reliable informants showing the existence of a vast criminal conspiracy engaged in the distribution of massive quantities of illegal drugs throughout the

---

[98]Defendant's Motion, Docket Entry No. 230, p. 2.

United States.  As explained above, the application that this court signed was a continuation of previously authorized wire intercepts. Those intercepts had already led to the seizure of 350 lbs of marijuana, 18 kilograms of cocaine, and smaller quantities of other drugs.  The seizures alone provided probable cause for continued intercepts.

## B.   The Dicksons' Car Business

Defendant argues that Agent Gainer's failure to mention that the Dicksons were involved in the sale of used luxury cars "seems to be a deliberate withholding of evidence that the Court could use to determine the truth of the agent's speculations."[99]   If Agent Gainer had mentioned the car business, Defendant argues, it would "provide a context" for R. Dickson's statement that the money seized from her at the Hobby Airport on December 4, 2015, was proceeds from the sales of vehicles.[100]

But Agent Gainer's Affidavit makes it clear that the Dicksons were involved in the car business.[101]   Moreover, even if Agent

---

[99]Defendant's Motion, Docket Entry No. 230, p. 5.

[100]Id.

[101]See Agent Gainer's Affidavit, Exhibit 1 to Government's Response, Docket Entry No. 235-2, p. 15 ¶ 19 ("CS-1 believes the unknown female also works at one of the **DICKSONS'** automotive business[es]."); p. 18 ¶ 21 ("Officers verified this information by contacting **D. DICKSON** at the telephone number provided . . . and confirmed he dispatched **TURNER** to haul the vehicle."); p. 19 ¶ 23 ("CS-2 stated **GRADY** and **DICKSON** own an automobile sales business together located on Old Spanish Trail, Houston, Texas.").

-21-

Gainer really had omitted any mention of the Dicksons' car business, the Defendant would still have to present evidence "directly illuminating the state of mind of [Agent Gainer]," and show "by a preponderance of the evidence that the omission was more than a negligent act." Martin, 615 F.2d at 329. He has not done so. Because Defendant has not met his burden, Defendant's Motion to Suppress will be denied.

### III. Motion to Dismiss for Pre-Indictment Delay

Defendant seeks to dismiss the indictment against him for the violation of his right to a speedy trial.[102] Defendant states that by the end of January of 2016, "the Government had the evidence against Defendant [] in hand," and thus the two-and-a-half-year delay between that time and Defendant's indictment was "unwarranted."[103] The Government responds that Defendant has failed to show that he was prejudiced by the delay or that the delay owed to bad faith on the part of the Government.[104]

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. Amend. VI. But because an unindicted person is not "accused," pre-indictment delay is "wholly irrelevant . . . as far as the Speedy Trial Clause of the Sixth Amendment is

---

[102]Defendant's Motion, Docket Entry No. 230, p. 12.

[103]Id. at 10.

[104]Government's Response, Docket Entry No. 235, p. 1.

-22-

concerned." <u>United States v. Lovasco,</u> 97 S. Ct. 2044, 2048 (1977).
Instead, statutes of limitations provide the primary protection
against pre-indictment delay. <u>Id.</u> at 2048 (quoting <u>United States</u>
<u>v. Marion,</u> 92 S. Ct. 455, 464 (1971)). Beyond this protection, the
Fifth Amendment requires dismissal of an indictment "if the
defendant can prove that the Government's delay in bringing the
indictment was a deliberate device to gain an advantage over him
<u>and</u> that it caused him actual prejudice in presenting his defense."
<u>United States v. Crouch,</u> 84 F.3d 1497, 1510 (5th Cir. 1996), <u>cert.</u>
<u>denied,</u> 117 S. Ct. 736 (1997) (citing <u>United States v. Gouveia,</u> 104
S. Ct. 2292, 2299 (1984)).

## A.   Prejudice

Defendant argues that his defense was prejudiced because the
Government's pre-indictment delay lost him "two witnesses that
could have testified on his behalf" — Seon Guy and Barry Walker.[105]
As explained above, Guy was deported to Trinidad and Tobago in
August of 2016,[106] thus making him unavailable to testify.
Defendant states that Walker moved to Costa Rica in June of 2017,
and has "evidently" changed his phone number.[107]

Defendant argues that Guy's testimony "would be crucial on a
hearing on the motion to suppress, and at trial" because Guy "would

---

[105]Defendant's Motion, Docket Entry No. 230, p. 9

[106]EARM Case Summary for Seon Joel Guy, attached as Exhibit 3
to Government's Response, Docket Entry No. 235-2, p. 65.

[107]Defendant's Motion, Docket Entry No. 230, p. 10.

deny being involved in a cocaine transaction with the Dicksons on December 3, 2015."[108]   Defendant states that Barry Walker "is a former Enron executive who was funding the 'floor plan' for [the] Dicksons'[] luxury used car business."[109]   Defendant claims that Walker's testimony "would have been helpful in the hearing on the motion to suppress, and at trial"[110] because Walker could speak on "his relationship with the [Dicksons] and their luxury used car business, and specifically [on] the December 4, 2015 seizure of currency from Regina [Dickson]."[111]

The Fifth Circuit has held that "absent a showing of extreme prejudice amounting to a Fifth Amendment denial of due process, the commencement of prosecution is controlled exclusively by the applicable statute of limitations." United States v. Smith, 487 F.2d 175, 177 (5th Cir. 1973). Defendant is charged with conspiracy to distribute cocaine under 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(ii),[112] the statute of limitations for which is five years. 18 U.S.C. § 3282(a). The superseding indictment indicates that Defendant's involvement in the Dickson DTO ended in January of

---

[108]Id. at 9.

[109]Id. at 9-10.

[110]Id.

[111]Additional Reply to Government's Response to Defendant's Motion to Suppress the Results of Illegally Obtained Wire Intercept, or to Dismiss the Indictment Based on a Violation of the Right to a Speedy Trial ("Defendant's Additional Reply"), Docket Entry No. 237, p. 3.

[112]Indictment, Docket Entry No. 1, p. 1.

2016.[113]   Defendant's indictment in July of 2018 was thus well within the five-year statute of limitations.   Accordingly, Defendant must show "extreme prejudice amounting to a Fifth Amendment denial of due process."   See Smith, 487 F.2d at 177.

To meet this standard "the defendant must offer more than mere speculation of lost witnesses, faded memories or misplaced documents; he must show an actual loss of evidence that would have aided the defense and that cannot be obtained from other sources." United States v. Jackson, 549 F.3d 963, 969 (5th Cir. 2008) (quoting United States v. Gulley, 526 F.3d 809, 819-20 (5th Cir.), cert. denied, 129 S. Ct. 159, 172 (2008)).   Accordingly, the Fifth Circuit has instructed that

> in all but the very clearest and most compelling cases, the district court, rather than grant [a motion to dismiss the indictment] prior to trial, should carry it with the case, and make the determination of whether actual, substantial prejudice resulted from the improper delay in light of what actually transpired at trial.

Crouch, 84 F.3d at 1516.

This is not a clear or compelling case.   Defendant has merely raised the speculative possibility that Guy and Walker might have testified on his behalf at trial had he been indicted sooner.[114] Guy was deported on August 16, 2016.   The Government points out

---

[113]Superseding Indictment, Docket Entry No. 135, p. 1.

[114]See Defendant's Motion, Docket Entry No. 230, p. 9 ("[Defendant] lost two witnesses that could have testified on his behalf, because of the delay.") (emphasis added).

correctly that even if it had indicted Guy before this date, the
indictment alone would not have been sufficient on its own to stop
his deportation[115] — Defendant would have had to show that Guy met
all the requirements for a material witness under 18 U.S.C. § 3144
in order to attempt to keep Guy in the United States.  An earlier
indictment would not have changed Guy's availability as a witness.

As for Walker, Defendant does not demonstrate that he had any
"evidence that would have aided the defense and that cannot be
obtained from other sources."   See Jackson, 549 F.3d at 969.
Defendant states that Walker helped finance the used car business
run by the Dicksons — but there is no dispute about the fact that
the Dicksons were involved in selling cars, nor any reason to doubt
that they would so testify at trial.  Defendant acknowledges that
he "can point to no specific testimony that [Walker] could
give[.]"[116]

Defendant has not made "a showing of extreme prejudice
amounting to a Fifth Amendment denial of due process," and so the
commencement of his prosecution is controlled exclusively by the
five-year statute of limitations.  See Smith, 487 F.2d at 177.

## B.   Bad Faith

Defendant argues that the Government's delay in indicting him
"was obviously an intentional device intended to gain a tactical

---

[115]Government's Response, Docket Entry No. 235, p. 9.

[116]Defendant's Additional Reply, Docket Entry No. 237, p. 2.

-26-

advantage over [Defendant]."[117] The Government responds that "[t]he ongoing investigation, volume of discovery compiled, and demanding case load of those involved were the only reasons for any delay in indicting [Defendant's] case."[118]

For pre-indictment delay to violate the Fifth Amendment Due Process Clause it must have been "intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose." Crouch, 84 F.3d at 1514. But investigative delay does not deprive a defendant of due process, "even if his defense might have been somewhat prejudiced by the lapse of time." Lovasco, 97 S. Ct. at 2052. "Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." Id. at 2051.

Defendant appears to argue that any pre-indictment delay, even investigative delay, is improper because "[e]very decision made by the Government in how and when to seek an indictment against a person can be seen as an attempt to assure that the case brought against a defendant gives the Government the best possible tactical

---

[117]Id. at 6.

[118]Government's Response, Docket Entry No. 235, p. 10.

-27-

footing in a contemplated trial.[119]    The Supreme Court explained
the distinction between permissible investigative delay and
impermissible bad-faith delay in <u>Lovasco,</u> 97 S. Ct. at 2051, and
nothing in the record suggests that this is a case of the latter.
Defendant argues that the Government delayed his indictment "in
order to continu[e] to bolster the case through the use of
cooperating informants,[120] but does not explain why gaining more
information to more assuredly secure a conviction should be
considered improper.

The court concludes that the Government's delay in indicting
Defendant was not undertaken for any bad-faith or impermissible
purpose, and thus Defendant's Motion to Dismiss the Indictment
Based on a Violation of the Right to a Speedy Trial will be denied.

## IV. **Conclusion and Order**

For the reasons set forth above, Defendant's Motion to
Suppress the Results of Illegally Obtained Wire Intercept, or to
Dismiss the Indictment Based on a Violation of the Right to a
Speedy Trial (Docket Entry No. 230) is **DENIED**.

This case is set for jury trial on May 24, 2021, at 1:00 p.m.,
in Courtroom 3-B, Ninth Floor, United States Courthouse, 515 Rusk
Street, Houston, Texas 77002.   By May 17, 2021, the parties will

---

[119] Defendant's Additional Reply, Docket Entry No. 237, p. 6.

[120] <u>Id.</u>

file their exhibit lists, copies of exhibit, final witness lists, and proposed jury charges.

**SIGNED** at Houston, Texas, on this the 7th day of April, 2021.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

29